IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARELLA O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV435 |
| | ) | |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Marella O. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on May 17, 2022, alleging a disability onset date of June 25, 2021. (Tr. at 17, 221-22.)[1] Her application was denied initially (Tr. at 100-06, 122-31) and upon reconsideration (Tr. at 107-17, 133-40). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 141-42.) On January 9, 2024, Plaintiff, along with her attorney, attended the subsequent

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

telephone hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 17, 35-74.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 28), and on April 9, 2025, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, June 25, 2021. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 19.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity, status-post cerebrovascular accident (CVA) with residual symptoms, headache/migraine, fibromyalgia, depressive disorder, and anxiety disorder[.]

(Tr. at 19.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 20-21.) The ALJ therefore assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] could frequently climb ramps and stairs, but only occasionally climb stepladders up to 4 vertical feet in height, with no climbing of higher ladders or of ropes or scaffolds of any height. She could frequently balance, kneel, and crouch [and] occasionally stoop and crawl. [Plaintiff] could frequently handle, finger, feel, push, pull, and use hand controls with the bilateral upper

> extremities. She could occasionally perform talk requirements as part of the assigned work. She could occasionally tolerate exposure to extreme cold, and to vibration, atmospheric conditions, moving mechanical parts, and high, exposed places. She could tolerate exposure up to and including moderate noise. She could perform work needing little or no judgment to do simple duties that can be learned on the job or in a short period of time, usually within 30 days, and for which little specific vocational preparation and judgment are needed. She could perform work requiring sustained concentration and persistence for no greater than approximately 2 hours at a time. She could perform work that is not frequently performed on an assembly line or at a similar production-pace. [Plaintiff] could tolerate occasional changes to the work setting and the manner and method of performing the assigned work [and] perform work that frequently provides for two 15-minute breaks and one 30-minute break for each 8-hour shift worked, occurring at such times as directed by the employer. She could tolerate occasional interactions with supervisors, coworkers, and the public when performing the assigned work.

(Tr. at 21.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff was unable to perform any of her past relevant work. (Tr. at 26.) However, the ALJ further found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 27-28.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 28.)

Plaintiff now contends that the ALJ failed to adequately account for the vocationally limiting effects of her migraine headaches when assessing her RFC, despite having included migraines among Plaintiff's severe impairments at step two of the sequential analysis. She notes that, although the ALJ limited her to work in an environment with no more than moderate noise to account for her migraine limitations, the ALJ omitted other potential RFC limitations relating to her migraines, such as the need for time off task or absences. (Pl.'s Br. [Doc. #7] at 6.)

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id.(quoting Cichocki, 729 F.3d at 177).

Here, as recounted in the administrative decision, Plaintiff testified that

> [s]he charted her migraines and had headaches five of [the] nine days [leading up to her January 2024 hearing]. Her headaches never fully go away. Headaches can cause nausea and vomiting, and she might try over the counter medication or other things. One headache lasted nearly a month and she went into the hospital for medication.

(Tr. at 22) (citing Tr. at 54-55). Plaintiff also indicated that she "can drive but she does not because she gets dizzy with headaches." (Tr. at 22, 56.) However, the ALJ ultimately concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (Tr. at 23.)

Plaintiff argues, in part, that the ALJ erred in finding Plaintiff's statements regarding the limiting effects of her headaches less than fully consistent with the medical evidence and other evidence of record. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.

> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 404.1529(c)(3):

> (i) [Plaintiff's] daily activities;
> (ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, the ALJ provided more than conclusory statements discounting Plaintiff's testimony. As instructed by the regulations, the ALJ considered the entire case record and explained his reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on her ability to work. This explanation was provided throughout the ALJ's RFC discussion.

For example, the ALJ considered Plaintiff's treatment records regarding her headaches, including a June 1, 2022 visit with her neurologist (Tr. at 23.) However, the ALJ found that Plaintiff's headaches "responded to medication" and that the record "did not support the alleged lack of functioning." (Tr. at 24.) This analysis is supported by the medical record. At the visit on June 1, 2022 discussed by the ALJ, Plaintiff indicated at that time that her migraines had recently worsened. (Tr. at 23, 725.) As for frequency, she indicated that the headaches were "occurring about twice a week on average" and lasted "3 or 4 hours at a time." (Tr. at 725.) Up until that time, Plaintiff had treated her migraines with ibuprofen and Flonase, but she found that they were no longer effective. (Tr. at 725.) Accordingly, Plaintiff's provider at Raleigh Neurology Associates, Dr. David Konanc, prescribed Zolmitriptan nasal spray to treat Plaintiff's acute migraines. (Tr. at 728, 729.) Other records similarly reflect increased headaches around the time of the June 1, 2022 visit with Dr. Konanc. In a visit with a Nurse Practitioner about two weeks earlier in May 2022, Plaintiff indicated that, in the two weeks leading up to the appointment, she experienced "right frontal headaches radiating to [the] occipital region," and which she treated with over-the-counter allergy medications, including cetirizine and Sudafed. (Tr. at 463.) In addition, two weeks after the visit with Dr. Konanc, on June 19, 2022, Plaintiff presented to the emergency department with complaints of a

headache, and providers concluded that her headache was a symptom of an infection, in this case a kidney infection accompanied by a high fever. (Tr. at 768.) Notably, Plaintiff again asserted that her "migraines and nausea h[ad] been worse since May." (Tr. at 768.) Thus, the medical record clearly reflects treatment for migraines/headaches in May and June 2022, and the ALJ acknowledged that treatment in the review of the record.

Most notably, a July 15, 2022 treatment note from Plaintiff's family medicine physician, Dr. Julia Sargent, just a few weeks later, reflects that Plaintiff had "a migraine every day for over a month," but this problem had "resolved," after the nasal spray prescribed by neurology to treat Plaintiff's migraines had been approved by insurance. (Tr. at 881.) Similarly, an October 2022 treatment record likewise reflects that she "had severe migraines through May and June followed by a kidney infection" and her headaches had "resolved." (Tr. at 865.) She reported ongoing nausea, and was assessed with depression and anxiety. (Tr. at 867.) The medical record does not include any further treatment records for headaches or migraines for the rest of 2022 or all of 2023. She did not return to her neurologist after June 1, 2022, and she did not return to any provider for treatment of migraines, although she continued to get treatment for fibromyalgia, muscles spasms, and depression and anxiety.[4]

Thus, the treatment records reflect that Plaintiff's migraine/headaches had "resolved", as reflected in the July 2022 and October 2022 treatment records, based on the medication

---

[4] She also did not seek migraine-specific treatment at any of her previous neurology appointments prior to June 2022. (See Tr. at 724-48.) In a Family Medicine assessment in July 2021, she noted "mild to moderate" headaches that "come and go" over the prior couple of weeks. (Tr. at 564.). In addition, on one prior occasion, in September 2021, Plaintiff presented at the Chatham Emergency Department complaining of three days of intermittent dizziness, posterior eye pressure, headache, and shortness of breath. (Tr. at 500.) Plaintiff tested positive for COVID-19, which her provider indicated as the likely source of her headache and other symptoms. (Tr. at 500.)

provided by Dr. Konanc, which provides substantial evidence for the ALJ's finding that Plaintiff's headaches "responded to medication." (Tr. at 24.) In addition, the lack of further treatment further supports the ALJ's finding that the headaches responded to medication, and that the record "did not support the alleged loss of functioning."

At the hearing, Plaintiff testified to recent migraines in 2024, during the week prior to the hearing. When asked about the frequency of her migraines, Plaintiff responded that she had "started getting them again almost every night," indicating that problem had recently resumed after a lull. (Tr. at 54) (emphasis added). She specifically testified that her headaches had been worse in the nine days leading up to her January 9, 2024 hearing. (Tr. at 54.) The ALJ next questioned Plaintiff about treatment, asking "are you having to sleep, or are you having to go in a dark room? Cold compresses on your head? What's going on there?" (Tr. at 54.) To this Plaintiff responded,

> well, I will do any number of those things. It just kind of depends on where I'm at in the headache, if I can get somewhere and try to quiet it down, to try to, you know, take me some Tylenol, put me something over my eyes. I'm usually doing [a] multitude of things, because I never know what's going to work.

(Tr. at 55.) Plaintiff also testified to a migraine that lasted "almost a month" that required her to go to the hospital until they could put her back on the medications to "contain the migraines" (Tr. at 55), which is consistent with the records of a June 2022 migraine that was resolved with medication. In addition, Plaintiff's testimony that she takes Tylenol to resolve her headaches likewise supports the ALJ's finding that Plaintiff's headaches were resolved with medication.

Notably, the ALJ acknowledged this testimony (Tr. at 22-23) and specifically included restrictions in the RFC in light of Plaintiff's testimony. The ALJ noted that Plaintiff gets "dizzy with headaches" (Tr. at 22, 56), and the RFC includes a limitation to no climbing ladders over 4 feet. In addition, the ALJ specifically found that Plaintiff "is limited to no greater than moderate noise exposures due to headache/migraine" (Tr. at 24), which is supported by Plaintiff's testimony that, when a headache began, she tried to "get somewhere . . . to quiet it down." (Tr. at 55.) The ALJ further explained that a limitation to no more than moderate noise also "provides [Plaintiff] with a working environment that is potentially less distracting and less stressful than work in areas of loud or greater noise." (Tr. at 24.) Thus, the ALJ specifically addressed Plaintiff's headaches/migraines based on the extent of the evidence in the record, and included specific limitations in the RFC directed to the testimony regarding the symptoms.

Plaintiff now contends that she would be absent from work due to migraines and headaches, but even taking Plaintiff's testimony regarding her recent migraine symptoms at face value, she still points to no evidence that these symptoms were so pervasive throughout the time period at issue that they required further RFC limitations, let alone a finding of disability. Rather, the record indicates that Plaintiff experienced two flares of migraine activity, one in May and June of 2022, and the other in the weeks leading up to her January 2024 hearing. Plaintiff, who bears the burden of proving disability, presents no evidence that her headaches would cause any specific work limitations. Given the record here, the ALJ was not required to include further restrictions regarding absences and time off task given the lack of support for such limitations, as well as contrary evidence, including Plaintiff's limited

treatment history. Plaintiff's current argument that migraines would cause her to miss two or more days of work per month, and therefore would be disabling, amounts to nothing more than conjecture. In fact, Plaintiff herself never testified that she would require such a restriction as a result of her migraines.[5]

Moreover, none of Plaintiff's providers or other medical sources opined that Plaintiff's headaches caused any limitations at all during the time period in question. Indeed, the Consultative Examiner concluded that Plaintiff had "no physical limitations" and had "physically improved" by the time of the April 2023 consultative examination. (Tr. at 24,1203-07). The Consultative Examiner also found that Plaintiff only "gave partial effort on some portions of the exam" and that "the exam included inconsistencies." (Tr. at 25, 1207). No medical provider opined that Plaintiff would miss work due to headaches or migraines, or that her headaches or migraines were in any way disabling. The ALJ considered this opinion evidence but nevertheless included limitations to account for Plaintiff's headaches, based on her testimony, but noted that Plaintiff's headaches/migraines resolved with treatment, and concluded that the headaches/migraines and other symptoms were not as disabling as alleged.

---

[5] Plaintiff relies on the Fourth Circuit's unpublished decision in Woody v. Kijakazi, No. 22-1437, 2023 WL 5745359, at *1 (4th Cir. Sept. 6, 2023), to argue that, because the ALJ "neither (a) included an absenteeism/off-task limitation in the RFC finding nor (b) explained why such a limitation was unnecessary," remand is required. (Pl.'s Br. at 7.) In Woody, the Court held that "the ALJ erred by not making specific findings regarding how often [the plaintiff] would be absent from work due to the frequency and severity of her headaches" where the "vocational expert testified a hypothetical person would be precluded from maintaining full time employment if she were absent more than once a month" and the record showed that, "even after receiving treatment that reduced the frequency of her headaches, [the plaintiff] still reported getting headaches about once a week.." This scenario differs significantly from the present case. Here, as set out above, Plaintiff presented no evidence that her migraine headaches occurred frequently throughout the alleged disability period or that they failed to respond to treatment. Thus, there was no basis for the ALJ to make specific findings regarding migraine frequency or severity when formulating Plaintiff's RFC.

Plaintiff does not point to any medical evidence that was not considered or addressed by the ALJ.

Accordingly, this is not a scenario in which the ALJ failed "to assess [the] claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). Here, the ALJ included Plaintiff's migraines among her severe impairments, crafted the RFC to account for her credibly established limitations, and explained the omission of additional limitations in accordance with the regulations and relevant case law, including Arakas. Accordingly, substantial evidence supports the ALJ's determination.

To the extent that Plaintiff essentially asks the Court to reconsider the ALJ's conclusions and re-weigh the evidence presented, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff) is disabled," but rather, "whether the ALJ's finding that [plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence and explained his conclusion in a lengthy, detailed decision. That determination is supported

by substantial evidence in the record. Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #7] be DENIED, that Defendant's Dispositive Brief [Doc. #9] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 27th day of August, 2026.

Joi Elizabeth Peake
United States Magistrate Judge